**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| FRIENDS OF THE PARKS, SYLVIA MANN, and JOHN BUENZ, | ) ) ) | |
| Plaintiffs, | ) ) | No. 14-cv-9096 |
| v. | ) ) | The Honorable John W. Darrah |
| CHICAGO PARK DISTRICT and CITY OF CHICAGO, | ) ) ) | |
| Defendants. | ) | |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO THE MOTIONS TO
DISMISS BY THE CITY OF CHICAGO AND THE CHICAGO PARK DISTRICT**

Dated: January 15, 2015

Respectfully submitted,

    /s/ Thomas H. Geoghegan
One of Plaintiffs' Attorneys

Thomas H. Geoghegan
Michael P. Persoon
Sean Morales-Doyle
77 West Washington Street, Suite 711
Chicago, Illinois 60602
(312) 372-2511

**Table of Contents**

Table of Contents ................................................................................................................. i

Table of Authorities ........................................................................................................... ii

Introduction ....................................................................................................................... 1

Argument ........................................................................................................................... 3

I.     Plaintiffs' challenge to actions by the Park District as set out in the Memorandum of Understanding and to be carried out immediately and in months to come is ripe now for adjudication. .................................................... 3

II.    Plaintiffs have standing ............................................................................................ 7

III.   The relief sought by plaintiffs will not infringe any separation of powers or apply to action by the City Council. .................................................................. 8

IV.   In Count I, plaintiffs sufficiently allege that the City and Park District will impair a property right without the due process required by the Fourteenth Amendment. ............................................................................................................. 8

    A.    Plaintiffs have a property interest. ............................................................... 8

    B.    Plaintiffs have adequately alleged a deprivation of a property interest without due process. ................................................................................. 12

V.    Plaintiffs have stated a claim for violation of Equal Protection. ...................... 13

VI.   The Park District is acting *ultra vires*. ............................................................. 13

VII.  The construction of the LMNA will encroach unduly on open space. ............. 16

Conclusion ...................................................................................................................... 18

# Table of Authorities

**Cases**

*Abbott Labs v. Gardner*, 387 U.S. 136 (1967) ............................................................... 4, 5

*Bd. of Regents v. Roth*, 408 U.S. 564 (1972) ................................................................ 11

*Booth v. Lemont Mfg. Corp.* 440 F.2d 385 (7th Cir. 1971) ........................................... 11

*Carlson v. United States*, 126 F.3d 915 (7th Cir. 1997) ............................................... 9

*Fiala v. Wasco Sanitary Dist.*, 2014 Ill. App. Unpub. LEXIS 916 (May 7, 2014) ................. 5, 8, 9

*Friends of the Parks v. Chicago Park District*, 203 Ill. 2d 312 (2003) ................................. passim

*Illinois Central Railroad Company v. Illinois*, 146 U.S. 387 (1892) .................................... passim

*Kaiser Aetna v. United States*, 444 U.S. 164 (1979) ....................................................... 10

*Lake Michigan Federation v. U.S. Army Corps of Engineers*, 742 F. Supp. 441 (N.D. Ill. 1990) ......................................................................................... 3, 7, 9, 17

*Lassiter v. Dept. of Social Servs.*, 452 U.S. 18 (1981) ..................................................... 12

*Nat'l Park Hospitality Ass'n v. DOI*, 538 U.S. 803 (2003) ............................................... 4

*Otto v. Somers*, 332 F.2d 697 (6th Cir 1964) ............................................................... 11

*Paepcke v. Public Building Commission*, 46 Ill. 2d 330 (1970) ........................................ passim

*People ex rel. Scott v. Chicago Park Dist.*, 66 Ill. 2d 65 (1976) ....................................... 3, 9, 10

*People v. Chicago Title & Trust Co.*, 75 Ill. 2d 479 (1979) .............................................. 9

*South Park Comm'rs v. Montgomery Ward & Co.*, 248 Ill. 299 (1910) ............................... 15

*Village of Willowbrook v. Olech*, 528 U.S. 562 (2000) ................................................... 13

**Statutes**

1903 Ill. Laws 263-64 ................................................................................................ 15

1911 Ill. Laws 435 ................................................................................................... 15

70 ILCS 1230/4 ...................................................................................................... 13, 14

70 ILCS 1290/1 ...................................................................................................... 14

70 ILCS 1505/12 ..................................................................................................... 13, 14

**Other Authorities**

Carol Rose, "Joseph Sax and the Idea of Public Trust," 25 Ecology L. Q. 351, 360 (1998)........................................................................................................................ 17

Epstein, *Takings: Private Property and the Power of Eminent Domain* (1985) ......................... 11

Epstein, The Public Trust Doctrine, 7 Cato J. 411 (1987)............................................................ 11

Joseph Sax, "The Public Trust Doctrine In Natural Resource Law: Effective Judicial Intervention," 68 Mich. L. Rev. 471 (1970).............................................................. 10

Journal of the Senate of 47th General Assembly of Illinois 941-42 (April 25, 2011).................. 15

**Treatises**

*Restatement (Second) of Trusts,* § 199....................................................................................... 5, 7

**Introduction**

In Count I, Plaintiffs allege that by failing to seek specific approval of the General Assembly, the Park District—under the direction of the City—will engage in an improper taking or impairment of the fractional beneficial interest of each Illinois citizen in a piece of property recovered from Lake Michigan. As set forth in the Memorandum of Understanding signed on September 8, 2014 (MOU), the Park District pledges to impair or dilute every citizen's beneficial interest in Chicago's Lakefront—a beneficial interest that every Illinois citizen has a well established legal standing to sue upon and protect—without the procedural due process required by Due Process Clause of the Fourteenth Amendment. *See* MOU, Am. Compl. Ex. A (Doc. # 3-1). In particular, by cutting the General Assembly out of the decision, and failing to seek authorization from a body that is less self-interested in commercializing the Lakefront, the defendants are rushing to impair a property interest without the "fundamental fairness" that the Due Process Clause requires. Only the General Assembly of Illinois can and should make the tradeoffs between preserving trust property as pristine open space and allowing a local government to build another tourist attraction and raise municipal revenue.

In Count II, plaintiffs contend that by entering the MOU and pledging to transfer the "exclusive right to occupy, use, maintain, manage and control" trust property to a private entity, the Lucas Museum of Narrative Art (LMNA), the defendants are denying their right to equal protection of the laws. This is not ordinary public property, but property in which all citizens have an equal beneficial interest, an interest of *equal* economic value, i.e. an equal share. But the MOU gives a different economic interest, of much greater value, to the LMNA. Indeed, it is a windfall; the LMNA will pay nothing for the impairment of the rights of the plaintiffs, and it will have an economic interest of disproportionate value. Nor does this windfall have any rational

relationship with a legitimate trust purpose. To the contrary, it effectively dissipates the trust property as free and open space.

In Count III, which arises under Illinois law, plaintiffs allege that the defendants simply have no authority to enter the MOU or transfer exclusive control of trust property to a private entity. The conveyance here is unlike that approved in *Friends of the Parks v. Chicago Park District*, 203 Ill. 2d 312 (2003). In that case, the Illinois Supreme Court emphasized that the Chicago Bears franchise did *not* control Soldier Field, or the trust property. Here by contrast, as set out in paragraph 10 of the MOU, the LMNA will have exclusive control of the museum site around the clock, 365 days a year, with no termination date, indeed, in perpetuity. *Compare Friends of the Parks,* 203 Ill.2d at 327 ("There is no abdication of control of the property to the Bears") *with* MOU (Doc. # 3-1) ¶ 10.

Furthermore, as alleged in Count I as well, the defendants simply have no authority to proceed without specific approval of the General Assembly. As set out in *Illinois Central Railroad Company v. Illinois*, the state and only the state can act as trustee and determine when there should be encroachments on pristine trust property. *See* 146 U.S. 387 (1892). That point was emphasized as well in *Friends of the Parks*, *supra*, where the Park District's claim of "ownership" was ignored as a relevant factor in the decision. The claim that a law enacted in 1903 could prove such legislative approval is directly in conflict with *Illinois Central*, *supra*, which allows a state legislature to delegate to a "municipality" only for a "limited period," and not for a century as defendants would like to claim.

Finally in Count IV, also arising under Illinois law, plaintiffs make one further claim against the encroachment proposed by the defendants. Even if the defendants did have authority to encroach on trust property (and they do not), and even if they can lawfully convey exclusive

control to a private entity (and they cannot) defendants would still be violating a duty to keep the bulk of the Lake front free and clear as an open space. The proposed construction of the LMNA—between Soldier Field and McCormick Place—leaves little open space left for any Illinois citizen to enjoy. There is already too much diversion of trust property from its original and proper use, and plaintiffs seek the opportunity to show how construction of yet another permanent building will destroy the character of the property as open space for decades to come. Plaintiffs contend that under the guidelines established in *Paepcke v. Public Building Commission*, 46 Ill. 2d 330 (1970), the defendants have now gone too far in encroaching on open space. *See also People ex rel. Scott v. Chicago Park Dist.*, 66 Ill. 2d 65 (1976) (finding that a purpose of trust property is to preserve a pristine physical environment); *see also Lake Michigan Federation v. U.S. Army Corps of Engineers*, 742 F. Supp. 441 (N.D. Ill. 1990) (finding a diminishment of open space and impeded access to Lake Michigan).

Plaintiffs ask this Court to deny the motions to dismiss and decide on the merits plaintiffs' challenge to their rights under both the Due Process Clause and Equal Protection Clause of the Fourteenth Amendment, and under the public trust doctrine as set forth in *Illinois Central* and more recent Illinois decisions applying and upholding the doctrine set forth in that case.

## Argument

### I.    Plaintiffs' challenge to actions by the Park District as set out in the Memorandum of Understanding and to be carried out immediately and in months to come is ripe now for adjudication.

Under the MOU, the Park District itself is already committed to transferring "exclusive control" of trust property to the LMNA. Under Paragraph 9, it is working with the LMNA to work out a detailed "development agreement" for construction and financing of the LMNA Museum and the roles of each party. MOU (Doc. # 3-1) ¶ 9. The Park District is actively

involved in the financing of the project. It is reviewing changes to plans and specifications as the project goes forward now. In Paragraph 10, the Park District is working to develop an operating agreement that will give full and exclusive control to the LMNA. *Id.* at ¶ 10. An enormous amount of work is already being undertaken. In short, the Park District at the direction of the City has already committed itself to the transfer of control. As set forth in Paragraph 10 in particular, the Park District has already repudiated any fiduciary or other duty to hold in trust the property on which the Museum will be built or to preserve it as open space.

Even if there are approvals from the Plan Commission and City Council still to come and even if they were in doubt (and they are not), the Park District at the direction of the City is going forward with the transfer of "exclusive" control set forth in Paragraph 10 of the MOU. Paragraph 10 is a firm repudiation of any legal duty—either to hold the property in trust without transfer of exclusive control to a private entity or even seek state legislative approval before going forward.

Accordingly, this case is ripe for adjudication under the two standards set out in cases like *Abbott Labs v. Gardner*, because the issue framed by Paragraph 10 is "fit for judicial decision" now and because plaintiffs will suffer hardship from postponing a decision. 387 U.S. 136, 148-49 (1967); *see also Nat'l Park Hospitality Ass'n v. DOI*, 538 U.S. 803, 814 (2003). The Park District is not deliberating whether to act—it is acting, now.

Furthermore, because the Park District has repudiated any legal duty and refused to seek the legislative approval for an impairment or change in use of their property rights, plaintiffs— like other citizens—are already suffering a cognizable legal injury, i.e., a breach of the trust owed to them by the relevant governmental actors. Under the law of trusts, it is well settled that beneficiaries do not have to wait for the breach of trust to occur. *See Restatement (Second) of*

4

*Trusts,* § 199(b) and comment b (a "beneficiary can maintain a suit to enjoin a breach of trust, if there is a reasonable likelihood that the trustee will commit such a breach"). They have standing to enjoin a breach that is reasonably likely to occur. *Id.* Under the public trust doctrine, every citizen has the rights of a beneficiary of a trust; and indeed, they have standing to sue to protect such beneficial interests. *See Paepcke v. Public Building Commission*, 46 Ill. 2d 330, 341-42 (1970). The state is not the full or true owner of such lands but merely holds legal title in its role as trustee for the real owners, the citizens of Illinois, the "real parties in interest." *Id.* at 336; *see also Fiala v. Wasco Sanitary Dist.*, 2014 Ill. App. Unpub. LEXIS 916, *9-*11 (May 7, 2014). In the still leading case of *Illinois Central*, the Supreme Court declares that such land is not state-owned public property in the ordinary sense—property that the state is free to build upon and sell. 146 U.S. at 452.

By entering the MOU, the Park District has pledged to give away that ownership interest to a private party—and done so without any due process or specific approval by the General Assembly. The Park District and City have made clear that they will seek no such approval and that Paragraph 10 of the MOU describes accurately the final deal. Accordingly, as set out in *Abbott Labs*, 387 U.S. at 150-51, this case is "fit for judicial decision." Paragraph 10 states that while Park District regulations may apply in some amorphous and inchoate way, a private entity will have exclusive control of the site, notwithstanding the holding in *Illinois Central* and the rule of decision in various Illinois cases.

Furthermore, as set out in *Abbott Labs*, plaintiffs will "suffer hardship" if a decision is delayed. *See* 387 U.S. at 152-53. Plaintiffs will suffer hardship or be prejudiced by delay in that (1) the Park District has already repudiated the legal duty owed to them to hold the property in trust, (2) it is already expending taxpayer funds and staff energies to act in concert with the

LMNA to attend to all the details necessary to carry out the breach of trust, and (3) it refuses to obtain the approval from the state legislature whereas a matter of due process plaintiffs should have an opportunity to protest and object.

In addition, plaintiffs face practical difficulties if a decision is postponed. The real life risk is that at any moment the City and Park District can begin construction and in fact they are in a sense already "erecting" a building on paper. Furthermore, it is a notorious fact of contemporary history that when the City and Park District *say* they need additional approvals, they have gone in to change Lakefront property—as in the bulldozing of Meigs Field—without waiting for that approval. Furthermore, a zoning change from the City Council could come without warning. That requires the plaintiffs to be on hair-trigger alert and seek a temporary restraining order from a court that has not previously had occasion to consider the legal issues. That is unfair to plaintiffs and a burden on the court that may be assigned to hear an emergency motion.

Finally, it is hard for defendants to deny that there is any doubt as to approvals of the Plan Commission or City Council. The Mayor and his appointees constitute a majority of the Plan Commission and it is fanciful to think they would block one of the Mayor's signature projects. It is equally fanciful to think that the City Council would block a zoning change, even if one were necessary. This is especially true since the City Council approval is not being sought for the project itself. And indeed, Paragraph 12 of the MOU states that "The City of Chicago and the Park District will cooperate with LMNA at their respective cost and expense in seeking" the necessary approvals. MOU (Doc. # 3-1) ¶ 12.

Accordingly, because Paragraph 10 frames the issue for decision and because plaintiffs would suffer hardship by having to remain on a daily hair-trigger alert to file an emergency motion, this case is ripe for adjudication now.

## II.     Plaintiffs have standing

For the same reasons set forth above, plaintiffs are suffering an injury now—a breach of the trust owed to them, a cognizable legal injury even if the breach is not consummated or only partly consummated at this time. *See Restatement (Second) of Trusts*, § 199(b) and comment b. Beneficiaries do not have to wait until an actual breach of trust. Like an anticipatory repudiation of a contract, Paragraph 10 is a pledge in effect that such a breach of trust will occur.

Furthermore, as demonstrated in these motions, there is a case or controversy now. There is no denial, for example, that defendants intend to proceed without any state legislative approval of this specific project. Likewise, defendants are perfectly clear that they can transfer exclusive control to a private entity like the LMNA, notwithstanding the clear holdings of cases from *Illinois Central* to *Friends of the Parks* that the state and any subordinate may never relinquish such exclusive control to such a private entity. *See Illinois Central*, 146 U.S. at 453; *Friends of the Parks*, 203 Ill. 2d at 326-27.

Finally, it is beyond doubt that as a general proposition, plaintiffs do have standing to assert their rights under the public trust doctrine. *See Paepcke*, 46 Ill. 2d at 341-42. Since *Paepcke,* a host of other judicial decisions presume the standing of plaintiffs to sue. *See e.g., Friends of the Parks*, 203 Ill. 2d 312, *Lake Michigan Federation*, 742 F. Supp. 441. Indeed, defendants do not challenge standing of plaintiffs to challenge the disposition *later*. In that sense, defendants' standing argument is really just a reiteration of its ripeness argument. For all the reasons set forth above, just as this case is ripe for adjudication, plaintiffs have standing to complain of a cognizable legal injury from an actual or anticipatory repudiation of a trust.

7

**III.    The relief sought by plaintiffs will not infringe any separation of powers or apply to action by the City Council.**

In this case plaintiffs challenge Paragraph 10 of the MOU—the agreement between the Park District and the LMNA to transfer exclusive control of a Museum and Museum Site to a private entity, without specific approval by the state legislature. Plaintiffs seek no relief against other actors like the Plan Commission, since any approval by the Plan Commission would be irrelevant if the Park District has violated a legal duty or repudiated such a duty, or denied due process by proceeding without state authority. Likewise, plaintiffs seek no relief as such against the City Council with respect to any zoning change incidentally necessary to the construction of the LMNA. The City Council will not approve the conveyance as such. It is irrelevant what the City Council does with respect to zoning if the defendants—the Park District acting at the direction of the City—may not proceed with the deal.

**IV.    In Count I, plaintiffs sufficiently allege that the City and Park District will impair a property right without the due process required by the Fourteenth Amendment.**

**A.    Plaintiffs have a property interest.**

Illinois courts have recognized that each citizen or taxpayer of Illinois has his or her own fractional beneficial interest in the property which the state of Illinois holds in trust for them. See, e.g., *Paepcke*, 46 Ill. 2d at 341-42; *see also Fiala*, 2014 Ill. App. Unpub. LEXIS 916 at *9-*11. Accordingly, courts have recognized the standing of the individual taxpayers—and virtually everyone pays some kind of tax in Illinois—to sue to protect that beneficial interest in land. While several cases assume standing, that assumption is grounded in the necessary inference that there could not be standing unless there was a property interest to protect. *Paepcke*, 46 Ill. 2d at 341-42. In *Paepcke* the Illinois Supreme Court recognized that such standing based on such a property interest was logically necessary for the public trust doctrine to have any meaning at all. *Id.*

8

Without discussing *any* of these cases, the City merely asserts that this beneficial interest in trust property is not a "secure entitlement." But it is "secure" enough that courts have struck down even legislative acts which interfere with it. *See, e.g., People ex rel. Scott, supra; Lake Michigan Federation*, *supra*. The City also says that the public trust doctrine merely puts "restrictions of the use of public land." But so do easements, servitudes, or beneficial interests—that is what property interests do. While these interests may constitute less than full legal ownership they are still property rights entitled to the protection of the Fourteenth Amendment. Furthermore, as declared long ago in *Illinois Central, supra,* this is not ordinary public land. As set forth above, land recovered from Lake Michigan is not "owned" by the state and the state holds only legal title. As stated in *Illinois Central,* and as quoted by the federal court in *Lake Michigan Federation*, such land is

> different in character from that which the State holds in lands intended for sale. It is a title held in trust for the people of the State that they may enjoy the navigation of the waters, carry on commerce over them, and have liberty of fishing therein freed from the obstruction or interference of private parties.

742 F. Supp. at 444 (quoting *Illinois Central*, 146 U.S. at 452) (citations omitted).

As further explained in *Paepcke* and more recently by the Illinois Appellate Court in *Fiala,* plaintiffs are the beneficial owners if not full owners of the property—and while not the holders of legal title, each citizen is the "real party in interest" as to his or her fractional share. *See Paepcke*, 46 Ill. 2d at 336, 341-42; *Fiala*, 2014 Ill. App. Unpub. LEXIS 916 at *9-*11; *see also Carlson v. United States*, 126 F.3d 915, 924-25 (7th Cir. 1997) (quoting *People v. Chicago Title & Trust Co.*, 75 Ill. 2d 479, 492-93 (1979)) ("in regard to an Illinois land trust, for tax purposes 'true ownership lies with the beneficiaries though title lies with the trustee'").

As beneficial owners, plaintiffs have the right—a property right—to exclude uses of the property that are inconsistent with their own right of use. That is literally the meaning of a

property right. *See, e.g., Kaiser Aetna v. United States*, 444 U.S. 164, 179-80 and n.11 (1979) (noting that the "right to exclude" is "universally held to be a fundamental element of the property right"). The Illinois courts have also expanded the uses which these property interests protect. In *People ex rel. Scott,* the Illinois Supreme Court recognized a new use, not mentioned in *Illinois Central,* namely, the right to preserve the open space as a natural resource. 66 Ill. 2d at 78-80. In at least two separate cases, *Paepcke* and *Scott,* the Illinois Supreme Court has favorably cited the pioneering law review article by Professor Joseph Sax, "The Public Trust Doctrine In Natural Resource Law: Effective Judicial Intervention," 68 Mich. L. Rev. 471 (1970). As set out in that article, the public trust doctrine protects not only access to Lake Michigan but the preservation of public trust land as a natural resource: it is an environmental protection law.

The beneficial interest of the plaintiffs is not just a "limit on the State" but a limit on private interests like those of the LMNA as well: it is a limitation on the whole world, so to speak, with respect to the right of plaintiffs to control the uses of the property. In *Illinois Central,* the United States Supreme Court made the point as follows:

> The trust devolving upon the State for the public, and which can only be discharged by the management and control of property in which the public has an interest, cannot be relinquished by a transfer of the property.

146 U.S. at 453. Even the state of Illinois has no ownership right except to act as trustee for the plaintiffs:

> The State can no more abdicate its trust over property in which the whole people are interested, like navigable waters and the soils under them, so as to leave them entirely under the use and control of private parties…than it can abdicate its police powers in the administration of government and the preservation of the piece.

*Id.*

10

It is important to distinguish this type of standing from taxpayer standing recognized in Illinois to bar misuse of public funds, where there is no property right at stake. *See, e.g., Booth v. Lemont Mfg. Corp.* 440 F.2d 385, 386-87 (7th Cir. 1971). Under the public trust doctrine, unlike the typical taxpayer standing case, citizens are not suing on behalf of the government, or to benefit the government. As noted in *Booth*, "the recovery of funds in such an instance is for the benefit of the municipality." *Id.* at 387 (quoting *Otto v. Somers*, 332 F.2d 697, 701 (6th Cir 1964)). However, in this case, plaintiffs are not suing to benefit the government but to benefit themselves. They are suing not to recover what the government owns but what Plaintiffs themselves own as beneficiaries of a trust. That distinguishes this case from *Booth*.

In *Paepcke,* the Court stated: "If the public trust doctrine is to have any meaning or vitality at all, the members of the public, at least taxpayers who are the *beneficiaries* of the trust, must have the *right* and standing to enforce it." *Paepcke*, 46 Ill. 2d at 341-42. As pointed out by Professor Richard Epstein, the Due Process Clause necessarily protects the "fractional" beneficial interest of each citizen in trust property. *See* Epstein, The Public Trust Doctrine, 7 Cato J. 411, 418-21 (1987); *see also* Epstein, *Takings: Private Property and the Power of Eminent Domain* (1985).

To be sure, not every violation of state law is a constitutional violation. However, it is not federal but *state* law which creates property rights—whether an easement, a servitude, or a beneficial interest. *See Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972). And property rights created by state law are what the Due Process Clause protects. *Id.* Unless plaintiffs have property rights, it is hard to give any logical account for the restraints on state action placed by the public trust doctrine. There is no ban on the conveyance or transfer of trust property in the U.S.

Constitution, or the Constitution of Illinois. It is not in any statute. The restriction on state action can only exist because plaintiffs have their own independent property rights under state law.

      **B.**    **Plaintiffs have adequately alleged a deprivation of a property interest without due process.**

In this case, unlike the situation in *Friends of the Parks*, the conveyance proposed in Paragraph 10 of the MOU will impair or diminish a property interest. In that case, in upholding a makeover of the Soldier Field stadium, the Court made the crucial point: "There is no abdication of control of the property to the Chicago Bears." 203 Ill.2d at 327. Indeed, as noted by the Court, the Bears take the field only for a certain number of days. *Id.* at 318-19. But Paragraph 10 of the MOU goes much farther: "…subject to the rules and regulations of the Park District, LMNA will have the exclusive right to occupy, use, maintain, manage, and *control* the Museum Building *and the Museum Site*." The LMNA has just the kind of "exclusive control" that was denied to the Bears and that is impermissible under *Friends of the Parks*.

Furthermore apart from this denial of substantive due process, i.e., an unlawful taking, the defendants have denied the plaintiffs a chance to oppose the action in the proper forum, the General Assembly of Illinois. The process that is "due" always varies with the circumstances, but this denial of the chance to oppose the project in the proper forum of the state legislature is a denial of "fundamental fairness" to plaintiffs. *See Lassiter v. Dept. of Social Servs.*, 452 U.S. 18, 24-25 (1981). Because the City and Park District have cut the General Assembly out of any role in this specific decision, plaintiffs do not have an opportunity to oppose or object to legislative action by a government actor that will have a more disinterested point of view. The process of weighing the pros and cons of a specific encroachment on trust property belongs to the General Assembly. That has clearly been the law since *Illinois Central*. It is also essential to ensure fundamental fairness, i.e., a decision by a disinterested governmental actor. The General

Assembly represents *all* the people of the state and necessarily takes a broader view than a local government. Indeed, the City and Park District have an inherent bias in favor of development, which brings in revenue to the City, as the open space preserved by the public trust doctrine does not. To remove that bias—the willingness of *local* governments to sell off trust property belonging to *all* the people of the state—is precisely why the State is the trustee. Where defendants would claim to act in place of the State, they are denying fundamental fairness or due process to plaintiffs.

**V.   Plaintiffs have stated a claim for violation of Equal Protection.**

In Count II, plaintiffs are not making a "class of one" challenge as in *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000). Rather they are challenging a windfall to the LMNA, an arbitrary exception to the rule that every citizen should derive the same economic benefit from the trust. Here the defendants are giving a right to LMNA to build free of charge on property from which all citizens should derive the same economic benefit—the disproportion in the value of this transaction to Mr. Lucas or the LMNA and every other person in the state is just too great. Nor does the transaction serve any legitimate purpose of the trust—it does nothing to enhance the value of the trust to all citizens. This arbitrary grant of a special privilege in trust property which is not supposed to treat citizens in a disparate manner violates the rights of plaintiffs under the Equal Protection Clause of the Fourteenth Amendment.

**VI.   The Park District is acting *ultra vires*.**

As set forth above, not even the General Assembly can convey away trust property; and only the General Assembly—not a municipality—can authorize a *diversion in the use* of trust property, even if there is no unlawful conveyance. *See Illinois Central*, 146 U.S. at 453; *see Friends of the Parks*, 203 Ill. 2d at 326-28. In Count III, plaintiffs contend that the defendants are acting without a specific authorization from the General Assembly. Defendants reply,

13

inconsistently (1) that under 70 ILCS 1230/4 and 70 ILCS 1505/12, the Park District owns the land free and clear and does not need to bother with the General Assembly, and (2) that alternatively, under 70 ILCS 1290/1, or the Park District Aquarium and Museum Act the General Assembly sufficiently authorized the construction of the LMNA—known popularly as the Star Wars Museum—a long time ago (though not so far away) in 1903, before motion pictures even existed. Both arguments conflict with state law precedent.

It may be that under 70 ILCS 1230/4 and 70 ILCS 1505/12, the General Assembly purports to vest in the Park District "right, title and interest" in land recovered from Lake Michigan. But in *Illinois Central,* 146 U.S. at 453, the U.S. Supreme Court states that it may not do so. The Court states that the "control of the state for purposes of the trust can never be lost." *Id.* Likewise, as the Court states, the State can never "abdicate its trust over property in which the whole people are interested." *Id.* It may delegate routine administrative duties only for a "*limited period…to a municipality or other bodies.*" *Id.* (emphasis supplied).

Significantly, in *Friends of the Parks, supra,* the Illinois Supreme Court did not discuss and gave no weight to the supposed "ownership" of Soldier Field by the Park District. Rather, pursuant to *Illinois Central*—which it reaffirmed—the Court focused on the approval of the project by the General Assembly. *Friends of the Parks,* 203 Ill. 2d at 324. The Court made the point that only the General Assembly can decide whether an encroachment on the land "owned" by the Park District was proper. Quoting *Paepcke* at length, the Court in *Friends of the Parks* states:

> The issues presented in this case illustrate the classic struggle
> between those members of the public who would preserve our
> parks and open lands in their pristine purity and those charged with
> administrative responsibilities who, under the pressures of the
> changing needs of an increasingly complex society, find it
> necessary, in good faith and for the public good, to encroach *to*

14

> *some extent* upon lands heretofore considered inviolate to change.
> *The resolution of this conflict in any given case is for the*
> *legislature and not the courts.*

*Id.* at 327-28 (quoting *Paepcke*, 46 Ill. 2d at 347) (brackets omitted, emphasis supplied).

In *Friends of the Parks,* the Court found that the General Assembly made that trade off in enacting the recent law creating the Illinois Sports Facilities Authority and empowering it to modernize Soldier Field. That specific and recent legislative authorization—not the Park District's ownership of the property—was the rationale for upholding the limited encroachment of open space.

Under that standard, the Park District has no authorization for its action here. It is impossible to argue that the state legislature made a similar considered trade off in 1903 when it passed the Park District Museum and Aquarium Act. In fact, the Act's history demonstrates that it was passed and amended with a specific project—the Field Museum—in mind.[1] Though the Act was amended in 1911 to make it superficially applicable to museums besides the Field Museum, this change was actually aimed at ensuring only that the construction of the Field Museum would move forward without facing a constitutional challenge.[2] Well over a century has passed, and the tradeoffs that have to be made have changed dramatically. Indeed, the proposed LMNA will be wedged between Soldier Field and McCormick Place, neither of which existed in

---

[1] The Act was passed in its original form in 1893, *see* 1903 Ill. Laws 263-64, excerpts attached hereto as Exhibit A, the year the Field Museum was founded, when it was located in the last building remaining from the World's Columbian Exposition, the present home of the Museum of Science and Industry. The Act was then amended in 1903 in order to allow for the construction of a new Field Museum building that was originally to be located in Grant Park by allowing park districts to "erect…edifices" for the purposes of housing "any museum…now located in any public park." *Id.*; *see also South Park Comm'rs v. Montgomery Ward & Co.*, 248 Ill. 299, 303-04 (1910) ("the act…was intended to apply, and as a matter of fact did apply, only to [the Field Museum]").

[2] The 1911 amendment removes the restriction to museums "now located in any public park," which really included only the Field Museum. 1911 Ill. Laws 435, excerpts attached hereto as Exhibit B; *see also South Park Comm'rs*, 248 Ill. at 303-04. But the General Assembly did not remove this restriction because it truly sought to authorize the erection of any museum in perpetuity. On the contrary, it removed the restriction in order to avoid litigation that might stop the timely construction of the Field Museum's new building. Journal of the Senate of 47th General Assembly of Illinois 941-42 (April 25, 2011), excerpts attached hereto as Exhibit C; *see also South Park Comm'rs*, 248 Ill. at 303-04.

1903 or 1911. The amount of open space has diminished. If the LMNA is built, it will be hard even to see any water or shore line at all as one starts out down Lake Shore Drive south of the Loop. Whatever authority existed at that time has gone stale.

In *Illinois Central*, the Supreme Court stated that delegations of this kind to a "municipality" can be only for "a limited time." 146 U.S. at 453. A period of a hundred and ten years is hardly a "limited time" for making such decisions. Furthermore, under the public trust doctrine, the General Assembly cannot abdicate for over a century its fiduciary responsibility— that is, under trust law, one must act as a person would act with respect to his or her own property. No fiduciary can leave that kind of responsibility to another for 120 years.

Furthermore, taken literally, the defendants would interpret the Park District Museum and Aquarium Act of 1903 to allow it construct enough museums for video games and other tourist-friendly amusements so as to wall off the entire Lake. Such an open ended delegation to build— and build, and build—cannot survive the holding in *Illinois Central*.

Finally, the transfer to the LMNA would be *ultra vires* even if authorized. It bears repeating that in *Friends of the Parks* the Court allowed the encroachment only because the Chicago Bears would not have exclusive control of Soldier Field. As the Court stated, "There is no abdication of control of the property to the Bears." 203 Ill.2d at 326. In the present case, however, the LMNA—unlike the Bears—will have exclusive control. Accordingly, for this reason as well, the Park District is engaged in an *ultra vires* act.

## VII.    The construction of the LMNA will encroach unduly on open space.

As set out in Count IV, even if defendants had authority to proceed (and they do not), this project encroaches unduly on open space. As stated above, the City and Park District are wedging in yet another huge structure between Soldier Field and McCormick Place. In effect, the defendants are creating an urban canyon on property that is supposed to be open space. At some

point, with or without legislative approval (and there is none here), such "urban development" simply goes too far.

In *Paepcke,* the Illinois Supreme Court proposed the "Wisconsin test" to review when an encroachment goes too far:

> In passing we think it appropriate to refer to the approach developed by the courts of our sister State, Wisconsin, in dealing with diversion problems….[T]he Supreme Court of Wisconsin approved proposed diversions in the use of public trust lands under conditions which demonstrated (1) that public bodies would control use of the area in question, (2) that the area would be devoted to public purposes and open to the public, (3) the diminution of the area of original use would be small compared with the entire area, (4) that none of the public uses of the original area would be destroyed or greatly impaired and (5) that the disappointment of those wanting to use the area of new use for former purposes was negligible when compared to the greater convenience to be afforded those members of the public using the new facility.

46 Ill. 2d at 343-44. The project in this case fails to meet conditions (1), (3), (4) and (5). Significantly, in *Lake Michigan Federation,* the district court found that the Loyola project was obstructing access to the Lake. Plaintiffs contend that there should be a balancing, but the bulk of the property must be preserved for trust purposes. *See* Carol Rose, "Joseph Sax and the Idea of Public Trust," 25 Ecology L. Q. 351, 360 (1998). Professor Rose analogizes the law of public trust with riparian water law. That law allows commercial users along rivers and streams to *some* limited "reasonable use" while preserving the bulk of the water as a natural resource. At least in this case the defendants are indifferent to their duty to preserve the bulk of the trust property as pristine and natural open space.

Apart from all the other legal objections set out in the complaint, this is just one commercialization too far. Indeed, one rationale for building the LMNA is that the area in question is already so overbuilt—and so devoid of open space—that one more building will

17

hardly matter. But it does. The defendants do not even pretend to claim that they considered the right balance or that they have any standard for making these decisions. The arbitrary and ad hoc nature of this decision which arises only from the fact that Mr. Lucas came courting is a reason why the management of the public trust is being unlawfully carried out by these defendants.

### Conclusion

For all the above reasons, plaintiffs request that this Court deny the motions to dismiss.


Dated: January 15, 2015                                       Respectfully submitted,

                                                             ____/s/ Thomas H. Geoghegan_____
                                                             One of Plaintiffs' Attorneys

Thomas H. Geoghegan
Michael P. Persoon
Sean Morales-Doyle
77 West Washington Street, Suite 711
Chicago, Illinois 60602
(312) 372-2511