UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| FRIENDS OF THE PARKS; ) | |
| SYLVIA MANN; and JOHN BUENZ, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | Case No. 14-cv-09096 |
| v. ) | |
| ) | Judge John W. Darrah |
| CHICAGO PARK DISTRICT and ) | |
| CITY OF CHICAGO, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs brought this action, seeking to bar or enjoin Defendants from approving or otherwise proceeding with the construction of a museum on land that is adjacent to Lake Michigan. Defendants have moved, pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), to dismiss the Complaint.

## BACKGROUND

The following is taken from the Complaint, which is assumed to be true for purposes of a motion to dismiss. *See Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 763 (7th Cir. 2010). Plaintiff Friends of the Parks ("FOTP") is a nonprofit park advocacy organization, dedicated to preserving, protecting, and improving Chicago's parks and forest preserves. Plaintiffs Sylvia Mann and John Buenz are residents of Illinois. Defendant Chicago Park District ("Park District") is "a body politic and corporate" established by state law. 70 ILL. COMP. STAT. § 1505/3. Defendant City of Chicago is a body politic and municipal corporation. (Compl. ¶¶ 6-10.)

In May 2014, a task force appointed by Chicago Mayor Rahm Emanuel issued a report recommending the parking lots south of Soldier Field as the site for constructing a museum, to be known as the Lucas Museum of Narrative Art. The Museum is to be operated by a nonprofit corporation also called the Lucas Museum of Narrative Art ("the LMNA") and will be dedicated to the exhibition of "narrative art" selected by the LMNA. The Mayor has publicly endorsed the proposed location. (*Id.* ¶¶ 13-16, 27.)

On or about September 8, 2014, the Park District entered into a memorandum of understanding ("MOU") with the LMNA, attached to the Complaint as Exhibit A. The MOU memorializes the terms discussed between the Park District and the LMNA, including the construction, use and operation of the Museum. (*Id.* Ex. A at 2, ¶ G.) It provides that the Museum will be located on the plot of land recommended by the task force and endorsed by the Mayor:

> The Museum will be located in the Museum Campus in the area generally lying between East Waldren Drive on the north and the McCormick Place Lakeside Center (East Building) on the south (the "Project Area").

(*Id.* Ex. A at 2, ¶ 1.) The "Project Area" is located within Burnham Park and consists entirely of land recovered from the navigable waters of Lake Michigan, most of it during the 1920s. (*Id.* ¶ 22.) Under the MOU (as more fully set out below), the LMNA "will have the exclusive right to occupy, use, maintain, manage and control the Museum Building and the Museum Site." (*Id.* Ex. A at ¶ 10.) The MOU does not specify whether the Museum will be owned by the LMNA, the City or the Park District. (*Id.* ¶¶ 28-29.)

On November 13, 2014, Plaintiffs filed a four-count Complaint, asserting federal claims under § 1983 for violation of due process and equal protection (Counts I and II, respectively) and state law claims that Defendants acted *ultra vires* and in violation of the public trust (Counts III

and IV, respectively). Defendants have moved to dismiss the Complaint under Rule 12(b)(1) for lack of standing and lack of ripeness and under Rule 12(b)(6) for failure to state a claim.

## LEGAL STANDARD

### *12(b)(1) Motion*

A Rule 12(b)(1) motion challenges standing and ripeness. Fed. R. Civ. P. 12(b)(1). Under Article III § 2 of the United States Constitution, federal courts are limited to hearing "cases" and "controversies." *Allen v. Wright*, 468 U.S. 737, 750 (1984). This case-or-controversy limitation requires "a claim that is ripe and a plaintiff who has standing." *Ind. Right to Life, Inc. v. Shepard*, 507 F.3d 545, 549 (7th Cir. 2007). These concepts are related but distinct: "Whereas ripeness is concerned with *when* an action may be brought, standing focuses on *who* may bring a ripe action." *Id.* (quoting *Pic-A-State Pa. v. Reno*, 76 F.3d 1294, 1298 n. 1 (3rd Cir. 1996) (emphasis in original)). The plaintiff bears the burden of alleging facts sufficient to establish standing and ripeness. *See, e.g., Scanlan v. Eisenberg,* 669 F.3d 838, 841-42 (7th Cir. 2012). The court may look outside of the complaint's allegations and consider whatever evidence has been submitted on these issues. *Ezekiel v. Michel*, 66 F.3d 894, 897 (7th Cir. 1995).

### *12(b)(6) Motion*

A Rule 12(b)(6) motion tests the legal sufficiency of the complaint. *Christensen v. County of Boone*, 483 F.3d 454, 458 (7th Cir. 2007). To survive a 12(b)(6) motion, a complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555). Rather, the complaint must provide

a defendant "with 'fair notice' of the claim and its basis." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008) (quoting Fed. R. Civ. P. 8(a)(2) and *Twombly*, 550 U.S. at 555).

For purposes of a motion under Rule 12(b)(1) or Rule 12(b)(6), the court accepts all well-pleaded factual allegations as true and construes all reasonable inferences in favor of the plaintiff. *Scanlan*, 669 F.3d at 841; *Tamayo*, 526 F.3d at 1081.

## ANALYSIS

### *Standing and Ripeness*

Defendants first argue that Plaintiffs' claims fail to satisfy the requirements of standing and ripeness because they are contingent on future events, specifically the approval of the Museum by the Chicago Plan Commission, the Chicago City Council and the board of the Park District. Plaintiffs respond that under the MOU, the Park District has already committed to a transfer of exclusive control of the public property to the LMNA, in breach of the public trust (as discussed more fully below) without legislative approval, and consequently, Plaintiffs are suffering an injury to their beneficial interest they hold in the property as citizens of Illinois.

Standing exists where a plaintiff can show: (1) a concrete and particularized injury that is actual or imminent; (2) a causal connection between the injury and the defendant's action; and (3) a likelihood that the injury can be redressed if the court finds in the plaintiff's favor. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). "All that a plaintiff need show to establish standing to sue [in the Article III sense] is a reasonable probability – not a certainty – of suffering tangible harm unless he obtains the relief that he is seeking in the suit." *Hoover v. Wagner*, 47 F.3d 845, 847 (7th Cir. 1995) (citing *Pennell v. San Jose*, 485 U.S. 1, 8 (1988)); *Sierakowski v. Ryan*, 223 F.3d 440, 443 (7th Cir. 2000) ("[A] plaintiff in search of prospective equitable relief must show a significant likelihood and immediacy of sustaining some direct

injury."). Thus, standing is not precluded simply because the harm is not immediate, but rather likely to occur in the near future. "Standing depends on the probability of harm, not its temporal proximity." *520 S. Michigan Ave. Assocs., Ltd. v. Devine*, 433 F.3d 961, 962 (7th Cir. 2006).

In *Paepcke v. Public Building Comm'n*, 263 N.E.2d 11, 18 (Ill. 1970), the Illinois Supreme Court addressed the standing of a group of taxpayers who sued to prevent the implementation of plans to construct facilities on public parks. The court held that the plaintiffs had standing to contest the proposed construction because they are beneficiaries of lands held in the public trust:

> If the "public trust" doctrine is to have any meaning or vitality at all, the members of the public, at least taxpayers who are the beneficiaries of that trust, must have the right and standing to enforce it. To tell them that they must wait upon governmental action is often an effectual denial of the right for all time. The conclusion we have reached is in accord with decisions in other jurisdictions, *see e.g., Robbins v. Department of Public Works*, 355 Mass. 328, 244 N.E.2d 577, and *Gould v. Greylock Reservation Com.*, 350 Mass. 410, 215 N.E.2d 114, wherein plaintiffs' rights as residents in a trust of public lands were enforced without question.

*Id.*; *see also Booth v. Lemont Mfg. Corp.*, 440 F.2d 385, 386n2 (7th Cir. 1971) (citing *Paepcke*, 263 N.E.2d 11, and noting that no special injury was needed to provide the requisite standing in a public trust suit); *Friends of the Parks v. Chicago Park Dist.*, 786 N.E.2d 161 (Ill. 2003) (plaintiffs, including present Plaintiff FOTP, brought public trust suit related to renovations made to stadium owned and operated by Chicago Park District); *Lake Michigan Fed'n v. U.S. Army Corps of Engin'rs*, 742 F. Supp. 441 (N.D. Ill. 1990) (plaintiffs, a not-for-profit corporation and individual taxpayers, brought public trust suit to enjoin construction of lakefill by private university).

Under *Paepcke*, it is clear that Plaintiffs have standing to assert their public trust and the related *ultra vires* state claims. Plaintiffs further have alleged their rights under the public trust

doctrine are being deprived without procedural due process and in violation of equal protection, so as to violate the federal Constitution. Plaintiffs have identified a concrete injury – that the lands held in the public trust are imminently in danger of being altered by the actions of Defendants – and this injury can be redressed by a favorable court decision. *See Lujan*, 504 U.S. at 560-61. Consequently, Plaintiffs have established that they have standing to pursue their state and federal claims.

In determining whether a case is ripe, courts will consider: (1) "the fitness of the issues for judicial decision" and (2) "the hardship to the parties of withholding court consideration." *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 201 (1983) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)). "Claims that present purely legal issues are normally fit for judicial decision." *Wis. Right to Life State PAC v. Barland*, 664 F.3d 139, 148 (7th Cir. 2011) (citing *Abbott Labs.*, 387 U.S. at 149).

Here, the Park District has signed an agreement, the MOU, with the LMNA regarding the terms of the construction of the Museum. Although Defendants argue that the Museum will need additional approvals before it is constructed, the MOU makes clear that the Park District has already committed to transferring control of public park land to the LMNA. Plaintiffs' claims

are based on that transfer of control of public trust land to a private entity. Consequently, Plaintiffs' claims are ripe for adjudication.[1]

Defendants' Motion to Dismiss is denied on the basis of standing and ripeness.

*Public Trust Claim*

In Count IV of the Complaint, Plaintiffs allege that Defendants have engaged in a breach of trust to Plaintiffs and other members of the public with respect to the subject property. The United States Supreme Court announced the public trust doctrine in *Illinois Central R. Co. v. Illinois*, 146 U.S. 387 (1892). The Supreme Court held:

> that the same doctrine as to the dominion and sovereignty over and ownership of lands under the navigable waters of the Great Lakes applies which obtains at the common law as to the dominion and sovereignty over and ownership of lands under tide waters on the borders of the sea, and that the lands are held by the same right in the one case as in the other, and subject to the same trusts and limitations.

*Illinois Cent. R. Co.*, 146 U.S. at 437. In other words, "the State holds title to submerged land, as is involved here, in trust for the people, and . . . in general the governmental powers over these lands will not be relinquished." *People ex rel. Scott v. Chicago Park Dist.*, 360 N.E.2d 773, 779 (Ill. 1976).

Under the public trust doctrine, the State cannot "abdicate its trust over property in which the whole people are interested . . . so as to leave them entirely under *the use and control of*

---

[1] Defendants also contend that Plaintiffs' claims violate the separation of powers doctrine, on the basis that those claims seek judicial interference in legislative actions. Specifically, they argue that Plaintiffs are asking this Court to enjoin the City Council from approving the zoning for the Museum before the City has even taken any action. Plaintiffs respond that they are not seeking relief against the Plan Commission or the City Council and that any zoning approvals are irrelevant to the question whether the Park District has violated a legal duty by proceeding without state authority. Plaintiffs' claims do not run afoul of the separation of powers doctrine. Rather, as discussed below, judicial oversight is necessary to ensure that the proposed transfer is consistent with preserving the public trust.

*private parties.*" *Illinois Cent. R. Co.*, 146 U.S. at 453 (emphasis added). State control over public lands cannot be relinquished "except as to such parcels as are used in promoting the interests of the public therein, or can be disposed of without any substantial impairment of the public interest in the lands and waters remaining." *Id.*

> [L]et it be said that this court is fully aware of the fact that the issues presented in this case illustrate the classic struggle between those members of the public who would preserve our parks and open lands in their pristine purity and those charged with administrative responsibilities who, under the pressures of the changing needs of an increasingly complex society, find it necessary, in good faith and for the public good, to encroach to some extent upon lands heretofore considered inviolate to change. The resolution of this conflict in any given case is for the legislature and not the courts.

*Paepcke*, 263 N.E.2d at 21. However, the purpose "of the public trust doctrine is to police the legislature's disposition of public lands." *Lake Michigan Fed'n*, 742 F. Supp. at 446. "If courts were to rubber stamp legislative decisions, . . . , the doctrine would have no teeth. The legislature would have unfettered discretion to breach the public trust as long as it was able to articulate some gain to the public." *Id*.

> Three basic principles can be distilled from this body of public trust case law. First, courts should be critical of attempts by the state to surrender valuable public resources to a private entity. . . . Second, the public trust is violated when the primary purpose of a legislative grant is to benefit a private interest. . . . Finally, any attempt by the state to relinquish its power over a public resource should be invalidated under the doctrine.

*Id.* at 445 (internal citations omitted).

This is not to say that the State can never relinquish control over lands held in the public trust. For example, in *People ex rel. Attorney Gen. v. Kirk*, the Illinois Supreme Court held that the conveyance of formerly submerged land to private parties was permissible:

> Under the authorities, the law seems to be well settled that the legislature was clothed with power to enact a law authorizing the extension of the driveway over and upon the waters of the lake, so long as the extension did not interfere with navigation, commerce, and the right of fishery upon the lake; and we see no reason why the submerged lands reclaimed by the extension of the driveway may not, as provided in the act, be appropriated for the payment of the improvement.

*People ex rel. Attorney Gen. v. Kirk*, 45 N.E. 830, 834-35 (Ill. 1896). The benefit to the private parties was to further the public purpose of extending Lake Shore Drive and was incidental to that purpose. *See id.* The Illinois Supreme Court further explained the public trust doctrine in regard to submerged lands in *Droste v. Kerner*: "The proper execution of this public trust with respect to submerged lands requires that the conveyance of any particular parcel to a shore owner be consistent with the public interest and not impair the interest of the public in the lands and waters remaining." *Droste v. Kerner*, 217 N.E.2d 73, 76 (Ill. 1966). In contrast, the legislative grant of submerged land to Loyola University of Chicago was struck down because "while the project has some aspects which are beneficial to the public, the primary purpose of the grant is to satisfy a private interest." *Lake Michigan Fed'n*, 742 F. Supp. at 445. The legislature can alienate the State's interest in public trust land if the primary purpose is not to satisfy a private interest and does not impair the interest of the public in the remaining lands and waters.

Plaintiffs claim that the construction of the LMNA will unduly encroach on open space. Plaintiffs apply the "Wisconsin test" to this claim and argue that the LMNA fails the test. However, while the "Wisconsin test" was discussed in *Paepcke,* it was not adopted as applicable in public trust cases[2], and the Illinois Supreme Court again declined to use the test in *Friends of the Parks*. *See Friends of the Parks*, 786 N.E.2d at 170 (citing *Paepcke*, 263 N.E.2d at 18-20).

---

[2] The "Wisconsin test" was set out in *Paepcke*: "the Supreme Court of Wisconsin approved proposed diversions in the use of public trust lands under conditions which demonstrated (1) that public bodies would control use of the area in question, (2) that the area

9

The most recent Illinois Supreme Court decision analyzing a similar issue is *Friends of the Parks*. In *Friends of the Parks*, the Illinois Supreme Court distinguished the Soldier Field renovation from the situation in *Illinois Central Railroad* where submerged land would be irretrievably lost to a private party. *Friends of the Parks*, 786 N.E.2d at 169. The court stated:

> There is little similarity between *Illinois Central* or *Scott* and the case before us. The Park District is, and will remain, the owner of the Burnham Park property, including Soldier Field. Neither the Act, the implementing agreements, nor the project documents provide for a conveyance of the Soldier Field property to the Bears. There is no abdication of control of the property to the Bears.

*Id.* at 170. The Illinois Supreme Court noted that the Park District would remain the owner of the Burnham Park property, there was no abdication of control of the property to the Bears, the Park District would remain as landlord under a lease agreement with the Bears, and the Park District would remain the owner of the remainder of Burnham Park. *Id.* Therefore, there was no need to determine whether transferred land would be used in promoting the interests of the public therein, or could be disposed of without any substantial impairment of the public interest in the lands and waters remaining. *See Illinois Cent. R. Co.*, 146 U.S. at 453. The Court did not reach the question of whether "a public trust challenge might be made on the basis that a diversion from the previously designated use of trust property is not justified unless certain standards are met." *Friends of the Parks*, 786 N.E.2d at 170. Instead, the Court adopted the

---

would be devoted to public purposes and open to the public, (3) the diminution of the area of original use would be small compared with the entire area, (4) that none of the public uses of the original area would be destroyed or greatly impaired and (5) that the disappointment of those wanting to use the area of new use for former purposes was negligible when compared to the greater convenience to be afforded those members of the public using the new facility." *Paepcke*, 263 N.E.2d at 19. The court in *Paepcke* referred to the test as a "useful guide for future *administrative action*." *Id.* at 20 (emphasis added).

rationale in *Paepcke* that legislative intent controlled in analyzing the tradeoffs between public benefits. *Id.*

The Memorandum of Understanding between the Park District and the LMNA outlines the agreement to build the museum. "The land on which the Museum will be located is owned by the Park District." (MOU, Recitals D.) Regarding an Operating Agreement, the MOU states:

> LMNA and the Park District will enter into an agreement governing the use of the Museum Site consistent with this MOU. The operating agreement will provide that, subject to the rules and regulations of the Park District, LMNA will have the exclusive right to occupy, use, maintain, manage, and control the Museum Building and the Museum Site. In furtherance of the foregoing, it is understood that notwithstanding the Park District's ownership of the Museum Site, so long as LMNA is operating the Museum for the Museum Purpose, LMNA shall have full and exclusive operational control of the Museum Building and any other improvements located on the Museum Site to permit LMNA (a) to make all repairs and improvements to the Museum Building and Museum Site, subject to Park District approval for material and substantial changes (to be defined in the operating agreement), and (b) to conduct all business and affairs related to the operation of the Museum, including, without limitation, the employment of all employees; the selection of content and manner of presentation of all programs, lectures and exhibits; the purchasing of all materials, supplies and equipment; the making of all interior alterations; and such other activities as may be necessary or appropriate to the operation of the Museum.

(MOU, Understandings ¶ 10.) The MOU states that it "is intended to provide a general framework for the subsequent negotiation of definitive agreements regarding the development and operation of the Museum and is not intended to create any binding contractual obligations on any party." (MOU, Understandings ¶ 19.) If the Park District and LMNA "do not execute a development agreement and an operating agreement, each as described above, within twelve (12) months of the date hereof, this MOU shall terminate." (*Id.*)

Defendants argue that the MOU "does not grant or convey anything . . . it merely provides the general framework for subsequent negotiations." (Internal citations omitted.) (Def. Park District Reply at p. 8.) Defendants further argue that, under the MOU, the Park District will

11

maintain ownership of the land, but ownership does not necessarily equal control. The MOU states that the Park District currently owns the land in question. However, the MOU also states the LMNA and the Park District will enter into an operating agreement, consistent with the MOU, which "*will provide* that . . . [the] *LMNA will have* the *exclusive right to* occupy, use, maintain, manage, and *control the Museum Building and the Museum Site*." (Emphasis added.) This language could be reasonably construed that the parties intend *any* future operating agreement will give LMNA exclusive control over public land.

Unlike the situation in *Friends of the Parks*, the MOU, as pled, could cause an abdication of control of the property to the LMNA. *See Friends of the Parks*, 786 N.E.2d at 170. There is also no indication the Park District will remain the owner of the property or would remain as a landlord under a lease agreement. However, as explained above, the Park District cannot abdicate its trust over public land so as to leave it entirely under the use and control of private parties. *Illinois Cent. R. Co.*, 146 U.S. at 453. The Complaint alleges enough facts to state that Defendants intend to transfer the exclusive right to use and control the Museum Site to a private entity. (*See* MOU, Understandings ¶ 10.) The Complaint plausibly states a claim that the agreement violates the public trust doctrine.

*Ultra Vires Claim*

In Count III of the Complaint, Plaintiffs allege that the Park District is acting *ultra vires* and without a specific authorization from the General Assembly. Defendants respond that the legislature has given the Park District control over public parks within Chicago and has given the Park District power to convey park lands for the proposed museum through the Park District Aquarium and Museum Act, 70 ILL. COMP. STAT. § 1230/1 *et seq.* Burnham Park, the proposed location of the LMNA, is owned by the Park District. The Legislature created the South Park

12

Commission in 1869 to acquire land to be transformed into parks. *See* 1869 Ill. Laws 358. In 1903, the Legislature passed the Park Commissioners Water Control Act, which granted park commissioners "control over any public park . . . bordering upon any public waters . . . the power to extend such park . . . over and upon the bed of such public waters," to connect and extend park lands. *See* 70 ILL. COMP. STAT. § 1230/1 *et seq.* These Acts vested the park districts with the authority of the Legislature over public park lands:

> The city of Chicago, to the extent of the jurisdiction delegated to it by its charter, is but an effluence from the sovereignty of Illinois, governs for Illinois, and its authorized legislation and local administration of law are legislation and local administration by Illinois through the agency of that municipality." *Byrne v. Chicago General Railway Co.*, 169 Ill. 75, 85, 48 N.E. 703, 705. The city held, and the park commissioners now hold, the park in the exercise of governmental powers in trust for the public.

*Ward v. Field Museum of Natural History*, 89 N.E. 731, 736 (Ill. 1909). Thus, the Park Districts act as delegates of the legislature in holding the parks in trust for the public.

In 1934, the Park District was created when the City's existing park districts were consolidated. *See* 70 ILL. COMP. STAT. § 1501/1. The Park District was given "title to all lands, property and funds of every description now owned or held by the park districts and corporate authorities superseded by the Chicago Park District." *Id.* at § 1505/12. Further, the Illinois Supreme Court has recognized that the Park District is the owner of Burnham Park. *See Friends of the Parks*, 786 N.E.2d at 170 ("The Park District is, and will remain, the owner of the Burnham Park property . . .").

The park districts' power to build and maintain museums in public parks, or to permit the directors or trustees of museums to do the same, comes from the Park District Aquarium and Museum Act, 70 ILL. COMP. STAT. § 1230/1 *et seq.* As originally written, the Museums in Parks

Act, "which limited the privilege to museums located in a public park on the first day of July, 1903, was intended to apply, and as a matter of fact did apply, only to [the Field Museum]." *S. Park Comm'rs v. Montgomery Ward & Co.*, 93 N.E. 910, 912 (Ill. 1910). However, the legislature amended the Museums in Parks Act and gave "the corporate authorities of park districts power to erect and maintain museums within any park, and to permit the directors or trustees of *any museum* to erect the same in any park and to charge an admission fee, except on certain days named." *Ward*, 89 N.E. at 735 (emphasis added).

Plaintiffs contend the legislature did not intend to give the Park District such broad authority. As the Journal of the Senate reflects, the reason the legislature amended the statute was to prevent a suit accusing the State of giving a special privilege to the Field Museum. *See* Journal of the Senate of the 47th General Assembly of the State of Illinois p. 941-42; *S. Park Comm'rs*, 93 N.E. at 912. The City and the Park District respond that the legislature chose to explicitly allow the construction of *any* museum: "[T]he corporate authorities of cities and park districts having the control or supervision of any public park or parks, are hereby authorized . . . to permit the directors or trustees of any museum . . . to erect and maintain its museum or museums within any public park now or hereafter under the control or supervision of any city or park district, and to contract with the directors or trustees of any such museum or museums relative to the erection and maintenance thereof." 1911 Ill. Laws 435. When statutory language "has a plain and unambiguous meaning with regard to the particular dispute in the case," that meaning controls and the court's "inquiry must cease." *KM Enters., Inc. v. Global Traffic Techn., Inc.*, 725 F.3d 718, 728 (7th Cir. 2013) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997)).

14

However, Plaintiffs also argue that the legislature can never abdicate control of property held in public trust. As discussed above, the seminal case, *Illinois Central Railroad*, (*see Lake Michigan Fed'n*, 742 F. Supp. at 444), holds that the state cannot "abdicate its trust over property in which the whole people are interested." *Illinois Cent. R. Co.*, 146 U.S. at 453 (emphasis added). There is a difference between public lands owned by the state and public lands subject to the public trust doctrine:

> That the State holds the title to the lands under the navigable waters of Lake Michigan, within its limits, in the same manner that the State holds title to soils under tide water, by the common law, we have already shown; and that title necessarily carries with it control over the waters above them, whenever the lands are subjected to use. *But it is a title different in character from that which the State holds in lands intended for sale.* It is different from the title which the United States hold in the public lands which are open to preemption and sale. It is a title held in trust for the *people of the State*, that they may enjoy the navigation of the waters, carry on commerce over them, and have liberty of fishing therein, freed from the obstruction or interference of private parties.

*Id.* at 452 (emphasis added); *see also People ex rel. Scott*, 360 N.E.2d at 779 ("It can be seen that the State holds title to *submerged land*, as is involved here, in trust for the people, and that in general the *governmental powers over these lands will not be relinquished*.") (emphasis added). The State has the authority to relinquish control over public trust lands, but it is a limited ability compared to public lands not held within the public trust.

Several cases involving the transfer of lands subject to the public trust doctrine have analyzed state legislation. In *Kirk*, a case in which a grant to a private entity was upheld, the Illinois Supreme Court considered whether the transfer of public trust land to private parties was valid "under an act of the legislature of the state of Illinois passed in the year 1889, and for the purpose of having removed the filling, breakwaters, and extension of the drive already made under said contracts." *Kirk*, 45 N.E. at 830. In *Paepcke*, the Illinois Supreme Court analyzed

15

"whether there has been a sufficient manifestation of legislative intent" to permit a school and park facility in Washington Park. *See Paepcke*, 263 N.E.2d at 15-20. In *People ex rel. Scott v. Chicago Park Dist.*, the Illinois Supreme Court analyzed whether a bill conveying submerged land to the United Steel Corporation violated the public trust doctrine. *People ex rel. Scott*, 360 N.E.2d at 777-781. The Illinois Supreme Court held that the public purpose contained in the bill was unpersuasive, and declared the bill void, because the dominating purpose was private. *Id.* at 781.

Whether the use of land protected by the public trust doctrine is permissible has been determined in light of authorizing legislation of the Illinois General Assembly. Land in the public trust is "held by the *whole people* for purposes in which the *whole people* are interested." *Illinois Cent. R. Co.*, 146 U.S. at 456 (emphasis added). Defendants have not presented a case, beginning with the recognition of the public trust doctrine in *Illinois Central Railroad* to the present, where a lesser representative public body than the Illinois legislature transferred or attempted to transfer an interest in public trust land to a private party on its own authority. All of these cases involved specific legislative enactments. The case law suggests action by the Illinois General Assembly is required to initiate the transfer of public land held in trust for all the citizens of Illinois. Therefore, Plaintiffs have plausibly stated a claim that conveyance of park lands by the Park District is *ultra vires* for the purposes of a motion to dismiss under 12(b)(6).

*Due Process Claim*

In Count I of the Complaint, Plaintiffs allege a Fourteenth Amendment due process claim. "Due process is a flexible concept which 'calls for such procedural protections as the particular situation demands.'" *Buttitta v. City of Chicago*, 9 F.3d 1198, 1201 (7th Cir. 1993) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)). In order to state a Fourteenth

Amendment procedural due process claim, Plaintiffs must allege that "(1) [they] had a constitutionally protected property interest, (2) [they] suffered a loss of that interest amounting to a deprivation, and (3) the deprivation occurred without due process of law." *LaBella Winnetka, Inc. v. Vill. of Winnetka*, 628 F.3d 937, 943-44 (7th Cir. 2010). The Constitution does not create property interests; rather, protected property interests must derive from an independent source such as state law. *Buttitta*, 9 F.3d at 1201 (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538 (1985), and *Bd. of Regents v. Roth*, 408 U.S. 564, 570 (1972)).

Here, Plaintiffs allege that Defendants are violating due process because Defendants are transferring control of the lakefront property to the LMNA without first obtaining authorization from the Illinois General Assembly. (Compl. ¶¶ 42-43.) Citing the Illinois Supreme Court's decision in *Paepcke*, 263 N.E.2d at 18, Plaintiffs argue that each taxpayer of Illinois has a fractional beneficial interest in the property which the state of Illinois holds in trust for them, so as to create a protectable property interest. Plaintiffs distinguish their claims from the typical taxpayer standing cases, such as in *Booth*, 440 F.2d at 386-87, where a plaintiff sues on behalf of the government to bar the misuse of public funds and does not have a property right at stake. Plaintiffs argue that here, they are not suing on behalf of the government, but rather, to enforce their own rights as beneficiaries of property held in the public trust. Plaintiffs further contend that they have been deprived of the chance to oppose Defendants' conveyance of property to the LMNA in the proper forum, the General Assembly of Illinois.

Construing the allegations in Plaintiffs' favor, as required, Plaintiffs have sufficiently stated a procedural due process claim under the Fourteenth Amendment. Plaintiffs have alleged a state-created property interest in the lakefront property and that Defendants' actions are depriving Plaintiffs of that interest. Plaintiffs further have alleged that Defendants have not

provided sufficient process for that deprivation by failing to obtain approval from the General Assembly. Consequently, Defendants' Motion to Dismiss is denied with respect to Count I.

*Equal Protection Claim*

In Count II, Plaintiffs assert a Fourteenth Amendment equal protection claim. Equal protection claims are claims of discrimination: "The purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether by express terms of a statute or by its improper execution through duly constituted agents." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (quoting *Sioux City Bridge Co. v. Dakota County*, 260 U.S. 441, 443 (1923)) (internal quotation marks omitted). Typically, such claims target "governmental classifications that 'affect some groups of citizens differently than others.'" *Engquist v. Or. Dep't of Agric.,* 553 U.S. 591, 601-02 (2008) (quoting *McGowan v. Maryland*, 366 U.S. 420, 425 (1961)). Less common are "so-called 'class of one'" equal protection claims, where a plaintiff alleges that "she has been irrationally singled out" for discriminatory treatment. *Engquist*, 553 U.S. at 601 (citing *Olech*, 528 U.S. 562). Where plaintiffs are not part of a protected class, their equal protection claims will be subject to a rational relationship scrutiny. *Zambrano v. Reinert*, 291 F.3d 964, 970 (7th Cir. 2002).

Here, Plaintiffs do not allege that they are part of a group of citizens that have been irrationally subjected to a discriminatory treatment by the government. Furthermore, in their Response brief, Plaintiffs concede that they are not making a "class of one" challenge. Rather, the basis of Plaintiffs' equal protection claim is that Defendants are granting the LMNA a "windfall" by "arbitrarily" granting the LMNA a special right to lakefront property. These allegations are insufficient to allege that there is no rational basis for Defendants' actions. *See*

*Wroblewski v. Washburn*, 965 F.2d 452, 460 (7th Cir. 1992) ("[t]o survive a motion to dismiss for failure to state a claim, a plaintiff must allege facts sufficient to overcome the presumption of rationality that applies to government classifications").

As Plaintiffs have failed to state an equal protection claim, Count II of the Complaint is dismissed pursuant to Rule 12(b)(6).

## CONCLUSION

For the reasons set forth above, Defendants' Motions to Dismiss [19, 22] are denied in part and granted in part. The Motions are denied as to Counts I, III and IV. Count II of the Complaint is dismissed without prejudice. Plaintiffs are granted leave to amend this claim, if they can do so in accordance with Rule 11, within thirty days of this Order.

Date:__March 12, 2015_____                      _____
                                                 JOHN W. DARRAH
                                                 United States District Court Judge